Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Plaintiff's Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOOTH FAMILY TRUST, derivatively on behalf of NVIDIA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JEN-HSUN HUANG, ROBERT K. BURGESS, TENCH COXE, PERSIS S. DRELL, JAMES C. GAITHER, DAWN HUDSON, HARVEY C. JONES MICHAEL G. McCAFFERY, MARK L. PERRY, A. BROOKE SEAWELL, MARK A. STEVENS, and COLLETTE M. KRESS,<br><br>Defendants,<br><br>and<br><br>NVIDIA CORPORATION,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED  SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff the Booth Family Trust ("Plaintiff"), through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant NVIDIA Corporation ("NVIDIA" or the "Company") against certain of its current and former officers and directors.  Plaintiff alleges upon

personal knowledge as to itself and its own acts, and as to all other matters upon information and belief based upon the substantial investigation of its counsel, as follows:

## NATURE OF THE ACTION

1.     NVIDIA created the graphics processing unit ("GPU").  The Company's gaming GPUs have long been recognized as the pillar of the Company's product line and strategy, accounting for much of its revenues.  NVIDIA's Directors and Officers have long been on notice of the importance of the GPU to the Company, and its short life cycle—rapidly becoming obsolete based upon technological advances.

2.     NVIDIA's GPUs have also become popular with cryptocurrency miners.  In public filings, press releases and quarterly conference calls with financial analysts, the Company's senior officers highlighted the success of NVIDIA's GPUs in gaming, while at the same time downplaying its reliance on the use of GPUs in cryptocurrency mining.  Defendants called the use of NVIDIA GPUs for cryptocurrency mining a mere "bonus" that would not detract from its core gaming business.

3.     From at least August 10, 2017 through at least November 15, 2018 (the "relevant period"), NVIDIA's officers and directors did not disclose that the Company's reliance on the cryptocurrency market was causing an oversupply of GPUs.  Likewise, the Individual Defendants (defined below) downplayed the financial repercussions this oversupply would have on NVIDIA, claiming that any reduction in cryptocurrency demand for GPUs would be more than met by a demand for gaming.  When cryptocurrency miners stopped buying GPU units due to a slowdown, NVIDIA found itself awash with GPUs that were rapidly becoming worthless.  Ultimately, the Company was forced to lower its revenue guidance to reveal that it had a backlog of inventory for GPUs, an increase

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of 30 percent from the previous quarter.  NVIDIA's financial condition has now been negatively impacted by this backlog of inventory due to the slowdown in the cryptocurrency market.

4.      In the wake of these revelations, class action lawsuits have been filed against NVIDIA and certain of its directors and officers, charging them with fraud in making false and misleading statements and omissions.  The Company will be forced to expend substantial sums defending itself in those actions and may be further materially damaged by a settlement of those actions or if a verdict is rendered against it at trial.

5.      While NVIDIA and its shareholders have been damaged by its directors' and officers' failures to manage these risks, the Company's officers have profited.  Indeed, while they were feeding false and misleading information into the market, causing the Company's stock price to be artificially inflated, they were selling their own shares at those very artificially inflated prices.  Moreover, in furtherance of their scheme to inflate the stock price, these directors and officers caused the Company to waste its assets repurchasing its stock at artificially inflated prices.

6.      The Individual Defendants' fiduciary breaches, failure to implement and maintain an effective system of internal controls, acts of mismanagement, and misconduct have caused, and will continue to cause, material damage to NVIDIA and its shareholders.  Plaintiff brings this derivative action to: a) recover damages from the Individual Defendants (defined below) for the benefit of the Company; and b) to require the Company to reform and improve its corporate governance practices and internal controls to protect NVIDIA and its shareholders from a repetition of the damaging events described herein.

7.      Plaintiff did not make a demand upon the NVIDIA Board of Directors (the "Board") prior to instituting this lawsuit since making such a demand would be a futile and wasteful act and it is, therefore, excused.  The Board is neither disinterested nor independent.  Rather, the directors face

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a substantial likelihood of liability due to their numerous breaches of fiduciary duties described herein.

## PARTIES

8.     Plaintiff, the Booth Family Trust, has continuously held NVIDIA shares since May 13, 2013, was a shareholder at the time of the transactions complained of herein, and will continue to hold NVIDIA shares throughout the pendency of this action.

9.     Nominal Defendant NVIDIA is a corporation duly organized and existing under the laws of the State of Delaware maintaining its principal offices at 2788 San Tomas Expressway, Santa Clara, California.  NVIDIA is a technology company that invented the graphics processing unit, or "GPU."  NVIDIA stock trades on the NASDAQ ("Nasdaq") under the ticker symbol "NVDA."

10.     Defendant Jen-Hsun Huang ("Huang") co-founded NVIDIA in 1993 and has since served as President, CEO, and a member of the Board. In 2018, NVIDIA paid Huang the following compensation:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $999,985 | $9,787,985 | $2,200,000 | $5,562 | $12,993,532 |

11.     Defendant Robert K. Burgess ("Burgess") has served as an NVIDIA director since 2011.  Burgess serves on the Board's Compensation Committee.  In 2018, NVIDIA paid Burgess the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12.     Defendant Tench Coxe ("Coxe") has served as an NVIDIA director since 1993. Burgess serves on the Board's Compensation Committee.  In 2018, NVIDIA paid Coxe the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

13.     Defendant Persis S. Drell ("Drell") has served as an NVIDIA director since 2015. Burgess serves on the Board's Compensation Committee.  In 2018, NVIDIA paid Drell the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

14.     Defendant James C. Gaither ("Gaither") has served as an NVIDIA director since 1998. Gaither serves on the Board's Nominating and Corporate Governance Committee.  In 2018, NVIDIA paid Gaither the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

15.     Defendant Dawn Hudson ("Hudson") has served as an NVIDIA director since 2013. Hudson serves on the Board's Audit Committee.   In 2018, NVIDIA paid Hudson the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

16.     Defendant Harvey C. Jones ("Jones") has served as an NVIDIA director since 1993. Jones serves on the Board's Compensation Committee and Nominating and Corporate Governance Committee.  In 2018, NVIDIA paid Jones the following compensation:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

17.     Defendant Michael G. McCaffery ("McCaffery") has served as an NVIDIA director since 2015.  McCaffery serves on the Board's Audit Committee.  In 2018, NVIDIA paid McCaffrey the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

18.     Defendant Mark L. Perry ("Perry") has served as an NVIDIA director since 2005.  Perry serves on the Board's Audit Committee and Nominating and Corporate Governance Committee.  In 2018, NVIDIA paid Perry the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

19.     Defendant A. Brooke Seawell ("Seawell") has served as an NVIDIA director since 1997.  Seawell serves on the Board's Compensation Committee.  In 2018, NVIDIA paid Seawell the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

20.     Defendant Mark A. Stevens ("Stevens") has served as an NVIDIA director since 2008.  Stevens serves on the Board's Audit Committee and Nominating and Corporate Governance Committee.  In 2018, NVIDIA paid Stevens the following compensation:

| Fiscal Year | Fees Earned in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $284,066 | $359,066 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.     Defendant Collette M. Kress ("Kress") has served as NVIDIA's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since 2013.  In 2018, NVIDIA paid Kress the following compensation:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $899,120 | $3,327,973 | $600,000 | $6,662 | $4,833,715 |

22.     The Defendants referenced in ¶¶10-21 are collectively referred to as the "Individual Defendants."

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

24.     This Court has general jurisdiction over each named Defendant who is a resident of California.  Additionally, this Court has specific jurisdiction over each named non-resident Defendant because these Defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  NVIDIA maintains its United States headquarters in California, and because the allegations contained herein are brought derivatively on behalf of NVIDIA, Defendants' conduct was purposefully directed at California.  Exercising jurisdiction over any non-resident Defendant is reasonable under these circumstances.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because: (a) NVIDIA maintains its principal executive offices in this District; (b) one or more of the Defendants resides in this District; (c) a substantial portion of the transactions and wrongs complained of herein—including

the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INDIVIDUAL DEFENDANTS' DUTIES

26.     Due to their positions as directors and officers of NVIDIA, and because of their ability to control the business and corporate affairs of NVIDIA, the Individual Defendants owed NVIDIA and its stockholders, among other duties, the fiduciary obligations of loyalty, due care and good faith. The Individual Defendants were, and are, required to act in furtherance of the best interests of NVIDIA and its stockholders, which, at a minimum, requires that they use their utmost abilities to manage NVIDIA in an honest and lawful manner.  The Individual Defendants were, and are, required to provide good faith oversight of the Company's operations, particularly with respect to the most significant risks the Company faces, as well as an affirmative obligation to ensure, at the very least, that the Company has systems designed to maintain compliance with the laws and regulations in the countries where it operates.  A fiduciary of a corporation is not loyally and in good faith discharging his or her fiduciary duties if, knowing that the company is noncompliant with mandatory legal obligations governing the company's core business, he or she does not take affirmative action to correct the deficiency.

27.     Corporations are managed by or under the direction of the board.  A director's meaningful and good faith oversight is particularly important when, as here, the board knows that management has financial incentives to: (a) not comply with the law; and (b) to treat such non-compliance as a business risk that, if realized, will be compensated by the company.  Directors acting in good faith to ensure compliance with the law may, for example, impose performance standards on executives for measuring their efforts in ensuring compliance with the company's mandatory legal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

obligations, hold executives accountable for continued non-compliance and continued failure to implement an effective control system, and seek outside review of the company's control systems.

28.     When management has demonstrated an inability and/or unwillingness to bring a corporation into compliance with mandatory legal obligations, directors have an affirmative obligation to protect the company and its stockholders.  Directors who are informed that management is nevertheless incapable and/or unwilling to implement compliant business practices that do not run afoul of laws, rules and regulations, are failing to act in the face of their known duty to stop illegal conduct and protect the company and its stockholders.

29.     Because of their positions of control and authority as directors of NVIDIA, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Through their directorial positions within NVIDIA, each Individual Defendant had access to information regarding the improper business practices of NVIDIA described herein.

30.     The conduct of the Individual Defendants complained of herein involves a culpable violation of their fiduciary duties, the absence of loyalty and good faith on their part, and a knowing, reckless and grossly negligent disregard for their duties to the Company and its shareholders.  The Individual Defendants were aware, or should have been aware, that those violations, the absence of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.

31.     Aside from their legally imposed duties as officers and/or directors of a publicly traded company, the Individual Defendants were also subject to particularized duties pursuant to specific policies in effect at NVIDIA.

**A.     The Code of Conduct**

32.     According to Defendant Huang, NVIDIA's Code of Conduct (the "Code") is a guide to how all Company employees must conduct themselves in everything they do.  "It describes the

principles that apply to how we act toward customers, partners, competitors, vendors, government regulators, stockholders, fellow employees, as well as the community at large."

33.     The NVIDIA Code of Conduct charges the Individual Defendants with safe-guarding the Company's assets, which includes preparing full, fair, and accurate reports filed with government agencies, such as the SEC.

34.     The Company further charges employees with avoiding improper insider trading: "We don't trade NVIDIA stock while we are aware of material, non-public information or outside of designated trading periods."

35.     Additionally, employees are implored to cooperate with ongoing investigations:

> Unless otherwise provided by law, we're required to cooperate with internal and external investigations and to provide complete, accurate, and truthful information. Our Legal Department responds to litigation or requests from governmental or other external agencies.   We never alter or destroy records in response to anticipated or actual litigation, investigations, or audits.   We should not discuss an investigation with anyone unless instructed.

36.     Any violations of the Code are to be reported to management, human resources, a legal representative, or NVIDIA Compliance.  All complaints must be responded to promptly through an email to NVIDIA Compliance.  The Compliance Committee's duties include:

> [I]nvestigat[ing] reports of suspected violations of Our Code promptly, thoroughly, and in accordance with our legal obligations.   We may determine that remedial action (such as training, enhanced controls, coaching, or communication) or **disciplinary action** (including *termination of employment*) is necessary.

**B.     The Corporate Responsibility Directive**

37.     The Individual Defendants are responsible for the development and implementation of NVIDIA's Corporate Responsibility Directive (the "Directive").

38.     The Individual Defendants must abide by the duties imposed by the Directive, which include:

- Maintaining the highest standards of business ethics and integrity;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Compliance with all applicable laws and regulations of the countries in which the Company operates; and

- Using a management system approach including risk assessments, audits and continuous improvement to achieve these objectives.

**C.    The Audit Committee Charter**

39.    NVIDIA's Audit Committee is appointed to ensure that the Board has implemented and maintained sufficient internal controls over the Company's financial reporting.  Further, the Audit Committee Charter imposes the following, among other, responsibilities on its members:

- Review financial statements to be included in the Company's Annual Report, such as risk factors, and the adequacy of such disclosures;

- In consultation with the management, the internal auditors and the auditors, review the Company's guidelines and policies with respect to risk assessment, risk management and internal financial and disclosure controls;

- Review with management and the auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies;

- Review periodically, either individually or as a committee and discuss with management and the auditors, as appropriate, the Company's financial disclosures;

- Review with management, the internal auditors and the auditors significant issues that arise regarding accounting principles and financial statement presentation the potential impact of regulatory and accounting initiatives, any off-balance sheet structures and any other significant reporting issues and judgments;

- Report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements and the Company's compliance with legal or regulatory requirements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SUBSTANTIVE ALLEGATIONS

**A.    The Individual Defendants Have Long Known of the Materiality of NVIDIA's Inventory to Its Financial Condition and Business Prospects**

40.    In its Annual Report on Form 10-K filed with the SEC on February 28, 2018 for the fiscal year ending January 31, 2018 (the "2018 10-K"), which was signed by all of the Individual Defendants, the Company stated the following:

> Our operating results have in the past fluctuated and may in the future fluctuate, and if our operating results are below the expectations of securities analysts or investors, our stock price could decline.  Our operating results have in the past fluctuated and may in the future continue to fluctuate due to numerous factors.  Therefore, investors should not rely on quarterly comparisons of our results of operations as an indication of our future performance.

> Factors, other than those described elsewhere in these risk factors, that could affect our results of operations in the future include, but are not limited to:

> - our ability to achieve volume production of our next-generation products;
>
> - our inability to adjust spending to offset revenue shortfalls due to the multi-year development cycle for some of our products and services;
>
> - **fluctuations in the demand for our products related to cryptocurrencies**[1];
>
> - **inventory write-downs**.

> Inventory cost is computed on an adjusted standard basis, which approximates actual cost on an average or first-in, first-out basis.  **We charge cost of sales for inventory provisions to write down our inventory to the lower of cost or net realizable value or to completely write off obsolete or excess inventory.  Most of our inventory provisions relate to the write-off of excess quantities of products, based on our inventory levels and future product purchase commitments compared to assumptions about future demand and market conditions.**

> Situations that may result in excess or obsolete inventory include changes in business and economic conditions, changes in market conditions, **sudden and significant decreases in demand for our products, inventory obsolescence because of changing technology** and customer requirements, failure to estimate customer demand properly, or unexpected competitive pricing actions by our

---

[1] Emphasis added throughout, unless indicated otherwise.

competition.  In addition, cancellation or deferral of customer purchase orders could result in our holding excess inventory.

The overall net effect on our gross margin from inventory provisions and sales of items previously written down was insignificant in fiscal years 2018 and 2017 and an unfavorable impact of 1.6% in fiscal year 2016.  **The charges we took to cost of sales for inventory provisions during these fiscal years were primarily related to the write-off of excess quantities of products whose inventory levels were higher than our updated forecasts of future demand for those products.**  As a fabless semiconductor company, we must make commitments to purchase inventory based on forecasts of future customer demand.  In doing so, we must account for our third-party manufacturers' lead times and constraints.  We also adjust to other market factors, such as product offerings and pricing actions by our competitors, new product transitions, and macroeconomic conditions - **all of which may impact demand for our products.**

41.     The ramifications to NVIDIA posed by a failure to adapt to ongoing trends in the market are expressly set out in the 2018 10-K :

**If we fail to meet the evolving needs of our markets, or identify new products, services or technologies, our revenue and financial results may be adversely impacted.**

We have created GPU-based visual and accelerated computing platforms that address four large markets: Gaming, Professional Visualization, Datacenter, and Automotive.  These markets often experience **rapid technological change, changes in customer requirements, new product introductions and enhancements, and evolving industry standards.  Our success depends on our ability to identify these emerging industry changes and to develop new (or enhance our existing) products, services and technologies that meet the evolving needs of these markets.**  Such activities may require considerable technical, financial, compliance, sales and marketing investments.  We currently devote significant resources to the development of technologies and business offerings in markets where we have a limited operating history, such as the automotive and datacenter markets, which presents additional risks to our business.  We must also continue to develop the infrastructure needed to appropriately scale our business in these areas, including customer service and customer support.  We also must meet customer safety and compliance standards, which are subject to change.  Additionally, we continue to make considerable investments in research and development, which may not produce significant revenue for several years, if at all.  **If our investments are unsuccessful and we fail to develop new products, services and technologies, or if we focus on technologies that do not become widely adopted, our business, revenue, financial condition and results of operations could be adversely affected.**  We cannot assure you that our strategic direction will result in innovative products and technologies that provide value to our customers, partners and ultimately, our shareholders.  **If we fail to anticipate**

-13-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**the changing needs of our target markets and emerging technology trends, or if we do not appropriately adapt that strategy as market conditions evolve, in a timely manner to exploit potential market opportunities, our business will be harmed.**

**B.    The Defendants Fail to Disclose the Company's Reliance on the Cryptocurrency Market**

42.    On August 20, 2017, NVIDIA issued a press release announcing its financial results for the second quarter of fiscal year 2018, ended July 30, 2017.  The Company reported revenue of $2.23 billion, up 56% from the same period one year earlier, and up 15% from the previous quarter. In the press release, Defendant Huang attributed some of that growth to "[d]atacenter revenue [increasing] more than two and a half times"; "[a] growing number of car and robot-taxi companies…choosing our DRIVE PX self-driving computing platform"; and NVIDIA technology being used to" power the Nintendo Switch home gaming system."

43.    On November 9, 2017, NVIDIA issued a press release announcing its financial results for the third quarter of fiscal year 2018, ended October 29, 2017.  The press release quoted Defendant Huang as stating:

> Our Volta GPU has been embraced by every major internet and cloud service provider and computer maker.  Our new TensorRT inference acceleration platform opens us to growth in hyperscale datacenters.  GeForce and Nintendo Switch are tapped into **the strongest growth dynamics of gaming**.  And our new DRIVE PX Pegasus for robotaxis has been adopted by companies around the world.  **We are well positioned for continued growth**.

44.    In a conference call with financial analysts held that same day, Defendant Kress represented:

> GPU sales also benefited from continued cryptocurrency mining.  We met some of this demand with a dedicated board in our OEM business and a portion with GeForce GTX boards, though it's difficult to quantify.  **We remain nimble in our approach to the cryptocurrency market.**  It is volatile, does not and **will not distract us from focusing on our core gaming markets**.

45.     During the conference call, Atif Malik of Citigroup Inc. asked: "[In the long term], why should we think that crypto won't impact the gaming demand in the future?  If you can, just talk about the steps NVIDIA has taken with respect to having a different load and all that."   In his response, Defendant Huang, downplayed cryptocurrency mining's importance to NVIDIA's financial condition and business prospects:

> The longer-term way to think about that is this.  **Crypto is small for us**, but not zero.  And I believe that crypto will be around for some time, kind of like today.  There will be new currencies emerging.  Existing currencies would grow and value.  **The interest in mining these new emerging currency crypto algorithms that emerge are going to continue to happen.**  And so I think for some time, **we're going to see that crypto will be a small but not zero part of our business.**
>
> **When you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world.  And our overall GPU business is really sizable.  We have multiple segments… And you know of course that we have gaming.  And so these different segments are all quite large and growing.  And so my sense is that although crypto will be here to stay, it will remain small but not zero.**

46.     Defendant Huang further represented on the conference call:

> [T[he ideal platform for new emerging digital currencies turns out to be a CUDA GPU.  And the reason for that is because there are several hundred million NVIDIA GPUs in the marketplace.  If you want to create a new cryptocurrency algorithm, optimizing for our GPUs is really quite ideal.  It's hard to do.  Therefore, you need a lot of computation to do it, and yet there's enough GPUs in marketplace, it's such an open platform, that the ability for somebody to get in and start mining is [a] very low [barrier] to entry.  **And so it's the cycles of these digital currencies.  And that's the reason why I say that digital currency crypto usage of GPUs, crypto usage of GPUs will be small but not zero for some time.**  And it's small because when it gets big, somebody will build a custom ASIC.  But if somebody builds a custom ASIC, there will be a new emerging cryptocurrency.  So it ebbs and flows.

47.     NVIDIA reported in its Quarterly Report on Form 10-Q for the third quarter of 2018 (the "Q3 2018 10-Q"), filed with the SEC on November 21, 2017, that between August 28, 2017 and September 24, 2017, the Individual Defendants caused the Company to repurchase "a total of 1 million shares [of common stock]… for $151 million."

48.     At the Credit Suisse Global Technology, Media & Telecom Conference held on November 29, 2017, Credit Suisse Managing Director John William Pitzer ("Pitzer") asked Defendant Kress the following:

> The other thing that I think was a little bit different about the October quarter relative to Gaming, and correct me if I'm wrong.  I think it was **the first time that you had mentioned cryptocurrency as being partly driven by – yeah, that's partly driving the Gaming side of the business**.  If you look at historically, it's been in the OEM business.  I think it was down almost 50% sequentially in the OEM portion, but you did say that some of that crypto demand was made up for in the Gaming.  Can you quantify that – I know it's not easy and I guess the more important longer-term question with Bitcoin hitting $11,000 earlier today.  **What's the longevity of that business[?]** I know that you guys have been very conservative about thinking about it longer-term, but in the last conference call, [Defendant Huang] talked about perhaps this being – having more legs or more sustainability than I think I've heard you guys talk about in the past.  Did I misinterpret that, or is that how you feel?

49.     In responding to Pitzer's question, Defendant Kress downplayed the impact of cryptocurrency demand on NVIDIA's gaming business:

> So, in the last two quarters we've been relatively consistent about cryptocurrency and our general point of view.  In Q2, is when we started to create board specifically for cryptocurrency that we classify in our OEM business.  Now keep in mind what that means is **these are boards that can be done for compute, okay, meaning they do not have any graphics capability, so they can't be used for overall Gaming.  And the reason we did this is, we wanted to make sure that we supplied the overall cards that we needed to our gamers, because that is our very important strategic importance that we did**.…  **There could be a good return on investment that says, I could actually buy a higher end game, I can actually do gaming and mining at the same time, if I was doing that.**

> [T]here probably is some residual amount or some small amount in terms of that and that's not something that we can visibly see.  We can visibly count and order them.  We do believe the majority does reside in terms of our overall crypto cards, which was the size of about $150 million in Q2, and it met our expectations in terms of Q3 that we thought it would be more residual.…  **There is a tail right now in terms of the current cryptocurrencies that we see.  We've probably reached in terms of its peak in the past, but that doesn't mean it goes away, or another way of looking at this is, it has some unique market dynamics to it.  There is a desire for cryptocurrency out there, whether or not people agree that it will exist …** there is a desire.  We have the ability to serve that market.

-16-

50.     On February 8, 2018, NVIDIA issued a press release announcing its financial results for the fourth quarter and fiscal year ended January 28, 2018.  The Company reported: "Record quarterly revenue of $2.17 billion, up 55 percent from a year ago.  Record full-year revenue of $6.91 billion, up 38 percent from a year ago, [and the] GPU computing platform continues to power gains across full product line."

51.     In the press release, Defendant Huang attributed the Company's growth, in part to: "[o]ur GPU computing platform…enjoying **rapid adoption** in artificial intelligence, cloud computing, **gaming**, and autonomous vehicles."  NVIDIA also highlighted the introduction of GeForce  GTX 1050 and 1050 Ti mobile GPUs for gaming laptops during the previous year.

52.     On that same day, the Company conducted a conference call with financial analysts in which Defendant Kress acknowledged a shortage of graphics cards due to high demand for cryptocurrency mining:

> **Strong demand in the cryptocurrency market exceeded our expectations.** We met some of this demand with a dedicated board in our OEM business, and some was met with our gaming GPUs.  This contributed to **lower than historical channel inventory levels of our gaming GPUs throughout the quarter.**  While the overall contribution of cryptocurrency to our business remains difficult to quantify, we believe it was a higher percentage of revenue than the prior quarter.

53.     However, Kress assured investors that NVIDIA's "main focus remains on our core gaming market, as cryptocurrency trends will likely remain volatile."

54.     On the conference call, C.J. Muse of Evercore Group LLC ("Evercore") asked if cryptocurrency is being modeled more conservatively.  Defendant Huang responded that the Company modeled cryptocurrency "approximately flat," meaning that it would stay the course on cryptocurrency despite the volatility of cryptocurrency value and demand for cryptocurrency mining GPUs.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

55.     Later in the conference call, Stacy Rasgon ("Rasgon") of Sanford C. Bernstein & Co., LLC ("Bernstein") pointed out that revenue from gaming minus the Nintendo Switch was around $140 or 150 million.  However, in the third quarter 2018 conference call, Defendant Kress did not cite the cryptocurrency market as a driving force.  In the fourth quarter, however, Kress represented that cryptocurrency was a driver of revenues.  In response to Rasgon's inquiry as to the discrepancy, Kress stated:

> We did talk about our overall crypto business last quarter as well.  We indicated how much we had in OEM boards, and we also indicated that there was definitely some also in our GTX business.  Keep in mind that's very difficult for us to quantify … [who the] end customer … is. But yes, there is also some in our Q3, and we did comment on it.  So here we are commenting in terms of what we saw in terms of Q4.  **It's up a bit from what we saw in Q3, and we do again expect it probably going forward.**

56.     Rasgon then asked about pent-up demand: "Normally your seasonality for gaming would be down probably double digits.  Do you think that pent-up demand is enough to reverse that normal seasonal pattern or normally down?  And can [gamers] find GPUs at retail … to satisfy … demand?"  Defendant Huang responded:

> So one way to think about the pent-up demand is we typically have somewhere between six to eight weeks of inventory in the channel.  And I think you would ascertain that globally right now the channel is relatively lean.  We're working really hard to get GPUs out into the marketplace for the gamers, and **we're doing everything we can to advise e-tailers and system builders to serve the gamers.** And so we're doing everything we can.  But I think the most important thing is **we've just got to catch up with supply**.

57.     On February 9, 2018, MarketWatch, a financial information website, noted that revenue from cryptocurrency boosted NVIDIA's results due to gaming chips that can be used for

cryptocurrency mining.[2]   Needham & Company's Rajvindra Gill, warned: "high crypto mining demand and potential volatility could spill off and cause fluctuations in the Gaming business."

58.     Despite analysts' concerns about the effect of a downturn in cryptocurrency mining on NVIDIA stock, the Individual Defendants assured them that the effect would be minor.  Thus, Chris Caso of Raymond James & Associates, Inc. was not concerned about NVIDIA:  "While investors are likely to question the sustainability of recent crypto-driven strength—and its impact on tight supply—management is taking a relatively conservative approach, assuming flat crypto demand in April and **highlighting pent-up 'traditional' gaming-driven demand**."[3] One journalist warned: "If cryptocurrency values crash, Nvidia could be stuck holding too much stock of a technology that tends to age quickly."[4]  As outlined below, this is precisely what happened, which the Company was forced to admit despite repeated assurances to the contrary throughout the relevant period.

59.     During the Morgan Stanley Technology, Media & Telecom Conference on February 26, 2018, Defendant Kress claimed that the Company's allocation of its GPUs is mainly geared towards gamers.  Kress stated that NVIDIA was working with suppliers to meet the demand for graphics cards.  In the short term, retail prices for GPUs were higher, which is something the Company does not "overall benefit from."

60.     In terms of the Company's conservative expectations for cryptocurrency modeling, Defendant Kress stated:

---

[2] Emily Barry, MarketWatch, *Nvidia Stock Gains as Data-Center Business Cheered, Though Crypto Concerns Remain*, February 9, 2018, https://www.marketwatch.com/story/nvidia-elicits-cheers-for-data-center-business-though-crypto-concerns-remain-2018-02-09.

[3] *Id.*

[4] Matthew Gault, Motherboard, *Nvidia Says' Gamers Come First' as Cryptocurrency Miners Continue to Hoard GPUs*, January 22, 2018, https://motherboard.vice.com/en_us/article/9knj73/as-cryptocurrency-miners-buy-gpus-in-bulk-nvidia-says-gamers-come-first.

The volatility in the short-term of the overall price of mining and the overall profitability merge them into the overall gaming. But we're going to really try our hardest to really focus our overall GPUs for gaming for our overall gamers going forward. Why it becomes very challenging for us to determine exactly how much of the mining is, is sometimes we see a gamer actually doing both in terms of the gaming and of course mining going forward. So you'll see us continue to focus on building specific cards for the overall mining and we think that is the best of breed and we can do that quite easily given our overall ability to produce many different types of GPUs for these markets.

61.     At the conference, Morgan Stanley's Joseph Moore asked: "Is there anything we should think about any context we should have in terms of how you're going to manage through the rest of the year when you have that combination of constrained inventory and the new products?" Defendant Kress responded:

Our overall cadence has been probably two, two and a half years over the last several different architectural increases that we've done now. So we still haven't even met the overall two year mark in terms of our overall Pascal bars that we have in doing markets. **They are still, remember, the best of breed in terms of overall performance against anything that is out in the market and we're still selling quite well.** So we're going to continue to focus on that as we move forward and stay tuned and we'll see what we can do in terms of announcing much later.

62.     On May 10, 2018, NVIDIA issued a press release announcing financial results for its first quarter, ended April 29, 2018. The Company reported "record revenue . . . of $3.21 billion, up 66 percent from $1.94 billion a year earlier, and up 10 percent from $2.91 billion in the previous quarter." Defendant Huang touted the Company's record revenue and emphasized that "gaming remained strong."

63.     On that same day, the Company conducted a conference call with financial analysts, in which Defendant Kress announced that gaming revenue was up $1.72 billion, a 68% year-to-year increase, but down 1% from the prior quarter. Kress also stated that demand was strong across regions and products, with the gaming market remaining "robust." She further stated: "[NVIDIA] continue[s]

to see demand from upgrades with about 35% of our installed base currently on our **Pascal architecture**."

64.     In the cryptocurrency market, "demand was again stronger than expected," according to Kress **"but we were able to fulfill most of it with crypto-specific GPUs, which are included in our OEM business at $289 million**.  As a result, we could protect the vast majority of our limited gaming GPU supply for use by gamers.  Looking into Q2, **we expect crypto-specific revenue to be about one-third of its Q1 level."**  Kress also highlighted the Company's continued investments in "key platforms driving its long-term growth, including gaming."

65.     On the conference call, Defendant Huang attributed GPU demand to gamers.  He went on to state:

> Surely, there was scarcity as you know.  **Crypto miners bought a lot of our GPUs during the quarter and it drove prices up.**  And I think that **a lot of the gamers weren't able to buy into the new GeForce as a result**.  And so **we're starting to see the prices come down**.  **We monitor spot pricing every single day around the world.**  And the prices are starting to normalize. It's still higher than where they should be.  And so obviously, **the demand is still quite strong out there.**

66.     Defendant Huang claimed there was "pent-up demand" in the overall "healthy" gaming market, and that GPU prices will hopefully normalize.  "[T]he demand [for games] is just really great."

67.     Mitch Steves of RBC Capital Markets asked: "[T]he OEM beat was pretty material given a lot of crypto revenue. Is it still the case that OEM is materially lower gross margin than your corporate average at this time?"   Kress responded: "Generally, our OEM business can be a little bit volatile.  Because remember, OEM business incorporates our mainstream GPUs as well as our Tegra integrated…. So yes, you're correct.  Again, **a very small part of our business right now.**"

68.     Christopher Rolland ("Rolland") of Susquehanna International Group wanted to know how NVIDIA's competitor made $150-160 million from cryptocurrency, accounting for 10% of their

sales.  Yet, NVIDIA made $300 million from cryptocurrency, which Rolland suggested could also include gaming.  Did this imply that NVIDIA has two-thirds or more of that market?  Was this due to pricing or do NVIDIA's competitors not know what is being sold to miners versus gamers?

69.     Defendant Huang responded:

> Well, we try to as transparently review our numbers as best we can.  Our strategy is to create a SKU that allows the crypto miners to fulfill their needs and we call it CMP.  And to be – as much as possible, fulfill their demand that way.  Sometimes, it's just not possible because **the demand is too great** but we try to do so.  **And we try to keep the miners on the CMP SKUs as much as we can.**  And so I'm not exactly sure how other people do it, but that's the way we do it.

70.     In response to a question about supply shortages, Defendant Huang was forced to admit the role cryptocurrency miners played in creating that shortage:

> The reason why **miners love GeForce** is because miners are everywhere in the world.  One of the benefits of cryptocurrency is that it's not any sovereign currency.  And it's in the digital world, it's distributed.  And GeForce is the single largest distributed supercomputing infrastructure on the planet.  Every gamer has a supercomputer in their PC.  And GeForce is so broadly distributed, it's available everywhere.   And so **GeForce is really a good candidate for any new cryptocurrency or any new cryptography algorithm that comes along.**  We try the best we can to go directly to the major miners.  **And they represent the vast majority of the demand.**

71.     During NVIDIA's annual shareholder meeting, Defendant Huang continued to claim that cryptocurrency mining was not important to the Company's growth:

> Ethereum and crypto mining is a recent GPU application.  **It is a bonus in our business,** but volatile.  **It's not really a factor in our core business.**  We have great growth drivers without crypto.

72.     Defendant Huang further stated: **"Our core gaming business** – our core businesses in gaming and high-performance computing and artificial intelligence and in self-driving cars are doing **so well that with or without crypto mining, we have a growth** – we have a **wonderful growth business behind us."**

73.    NVIDIA reported in its Quarterly Report on Form 10-Q for the first quarter of 2019 (the "Q1 2019 10-Q"), filed with the SEC on May 22, 2018, that: between January 29, 2018 and February 25, 2018, the Individual Defendants caused the Company to repurchase two million shares at $238.63 per share, costing the Company approximately $477.3 million; and between February 26, 2018 and March 25, 2018, the Individual Defendants caused NVIDIA to repurchase one million shares of its own common stock at $236.25 per share, for an approximate cost of $236.3 million.

### C.    The Truth Begins to Emerge

74.    On August 16, 2018, NVIDIA filed with the SEC a Current Report on Form 8-K lowering its revenue guidance 2.2% for the third quarter.  Further, the Company disclosed that GPU inventory was up 30% from the previous quarter.  According to the CFO's commentary: "Our revenue outlook had anticipated cryptocurrency-specific products declining to approximately $100 million, while actual crypto-specific product revenue was $18 million.  Whereas **we had previously anticipated cryptocurrency to be meaningful for the year, we are now projecting no contributions going forward.**"  NVIDIA further revealed that GPU inventory at the end of the quarter was $1.09 billion, compared with $797 million in the prior quarter, an increase of more than 30%.  On this news, NVIDIA stock declined by $12.62 per share, or 4.9%.

75.    The Company held a conference call with financial analysts that same day in which Defendant Kress announced that the gaming market was "vibrant."  However, "[OEM] revenue declined by 54% year over year, and 70% sequentially.  This was primarily driven by **the sharp decline of cryptocurrency revenues** to **fairly minimal levels**."  Kress did not include contribution from cryptocurrency in the Company's third quarter outlook.

76.    In response to a question from Cowen Inc.'s Matthew D. Ramsay inquiring about gaming channel inventory, Defendant Huang answered:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Matt, on the channel inventory side, we see inventory in the lower ends of our stack. And that inventory is well positioned for back-to-school and the building season that's coming up on Q3. And so I feel pretty good about that. **The rest of our product launches and the ramp-up of Turing[5] is going really well.** And so I think the rest of the announcements we haven't made, but stay tuned. The RTX family is going to be a real game changer for us and the reinvention of computer graphics altogether has been embraced by so many developers. We're going to see some really exciting stuff this year.

77.    C.J. Muse of Evercore asked if NVIDIA is embedding into its plans any drawdown of inventory in the short term. Defendant Huang responded:

> **We're expecting the channel inventory to work itself out.** We are masters of managing our channel and we understand the channel very well. As you know, the way that we go to market is through the channels around the world. **We're not concerned about the channel inventory.** As we ramp Turing, whenever we ramp a new architecture, we ramp it from the top down. And so we have plenty of opportunities as we go back to the back-to-school in the gaming cycle to manage the inventory. So we feel pretty good about that.

78.    In response to a question from Tim Arcuri of UBS about the potential for graphics cards being sold off on eBay (in light of the cryptocurrency crash), thus cannibalizing new Pascal GPU sales, Defendant Huang stated:

> Well the crypto mining market is very different today than it was three years ago. And even though new cards – **at the current prices, it doesn't make much sense for new cards to be sold into the mining market. The existing capacity is still being used and you could see that the hash rates continue.** And so my sense is that the installed base of miners will continue to use their cards. And then probably the more important factor though is that we're in the process of announcing a brand new way of doing computer graphics. And with Turing and the RTX platform, computer graphics will never be the same. And so I think this, our new generation of new GPUs is really going to do great.

79.    Thus, while touting the Company's ability to fend off secondary market sales with new product, Defendant Huang also revealed that NVIDIA's oversupply of GPU inventory was soon going to become obsolete, if it was not already.

---

[5] Turing is a recent addition to the Company's GPU lineup, which provides a new core architecture for advanced PC gaming.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### D.    The Truth is Revealed

80.    On November 15, 2018, the Company released its financial results for the third quarter of fiscal year 2019, ended October 28, 2018.  In a press release filed with the SEC, it was announced: "Our near-term results reflect excess channel inventory post the crypto-currency boom, which will be corrected."  The Company's excess inventory of GPUs caused it to revise down its fourth quarter guidance by over 7%.  Defendant Huang was forced to admit that "[g]aming revenue was short of our expectations, and our [Q4 2019] outlook is impacted by excess channel inventory of [Pascal GPUs]."[6]

81.    On this news, NVIDIA declined by $57.69 per share, or 28.5%, over the next two trading sessions.

82.    NVIDIA reported in its Quarterly Report on Form 10-Q for the third quarter of 2019 (the "Q3 2019 10-Q"), filed with the SEC on November 15, 2018, that:  between July 30, 2018 and August 26, 2018, the Individual Defendants caused the Company to repurchase 116,000 NVIDIA shares at $240.87 per share, for an approximate cost of $27.9 million; between August 27, 2018 and September 23, 2018, the Individual Defendants caused NVIDIA to repurchase 567,000 shares at $266.09 per share, for an approximate cost of $150.9 million; and between September 24, 2018 and October 28, 2018, the Individual Defendants caused NVIDIA to repurchase 82,000 shares at $255.41 per share, for a total cost of $20.9 million.

---

[6] Paul Lilly, PC Gamer, *Crypto-mining crash Leaves Nvidia with 'Excess' Inventory of Pascal Cards*, November 16, 2018, https://www.pcgamer.com/crypto-mining-crash-leaves-nvidia-with-excess-inventory-of-pascal-cards/.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**E.    Individual Defendants Make Insider Sales of NVIDIA Stock Before the Truth Is Fully Revealed**

83.    Throughout the relevant period, certain of the Individual Defendants sold NVIDIA stock while in possession of material, adverse non-public information regarding the Company, its financial condition and business prospects.

| Defendant | Date | Number of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|---|
| Huang | Sep 6, 2017 | 110,000 | $166.08 | $18,268,800 |
| Coxe | Sep 18, 2017 | 50,000 | $189.62 | $9,481,000 |
| Drell | Dec 20, 2017 | 606 | $197.07 | $119,424 |
| | Mar 28, 2018 | 5,141 | $220.73 | $1,134,772 |
| Gaither | Feb 15, 2018 | 40,359 | $245.67 | $9,914,995 |
| | May 31, 2018 | 45,000 | $253.59 | $11,411,550 |
| Hudson | Nov 13, 2017 | 15,000 | $213.44 | $3,201,600 |
| | Nov 22, 2017 | 3,052 | $214.39 | $654,318 |
| Jones | Sep 21, 2017 | 100,000 | $185.65 | $18,565,000 |
| | June 26, 2018 | 100,000 | $242.11 | $24,211,000 |
| Perry | Aug 14, 2017 | 16,281 | $162.24 | $2,641,429 |
| | Feb 12, 2018 | 17,307 | $227.93 | $3,944,784 |
| Seawell | Sep 1, 2017 | 30,000 | $170.19 | $5,105,700 |
| | Nov 20, 2017 | 1,029 | $214.10 | $220,308 |
| | Jun 4, 2018 | 20,000 | $264.64 | $5,292,800 |
| | Jun 5, 2018 | 1,029 | $264.85 | $272,530 |
| Stevens | Sep 20, 2017 | 80,250 | $187.23 | $15,025,207 |
| | Jun 13, 2018 | 38,040 | $263.61 | $10,027,724 |
| Kress | Oct 9, 2017 | 22,808 | $185.31 | $4,226,550 |
| | Dec 14, 2017 | 171 | $185.57 | $31,732 |
| | Jun 21, 2018 | 889 | $257.64 | $229,041 |
| | Sep 20, 2018 | 11,576 | $266.31 | $3,082,804 |

84.    All told, between September 6, 2017 and September 2018, NVIDIA insiders sold 708,538 shares for total proceeds of $147,063,061.

**F.    Lawsuits Are Filed Against NVIDIA**

85.    Starting on December 21, 2018, securities fraud class actions were filed in this District regarding the misconduct described herein.  The lawsuits allege violations of Section 10(b) and Rule 10b-5 promulgated thereunder by the SEC, as well as Section 20(a) of the Exchange Act.  Huang and

Kress are named as defendants in the securities fraud class action lawsuits. The Company has been damaged by incurring substantial costs in defense of the securities class action lawsuits and will be forced to incur further material expense if there is an unfavorable verdict at trial or in the event of a settlement.

## DERIVATIVE ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of NVIDIA to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants alleged herein. NVIDIA is named as a nominal defendant solely in a derivative capacity.

87.     Plaintiff is a current stockholder of the Company and was a stockholder during the transactions complained of. Plaintiff will continue to hold NVIDIA shares through the completion of this action.

88.     Plaintiff will adequately and fairly represent the interests of NVIDIA and its stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting derivative actions.

89.     This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## DEMAND IS EXCUSED

90.     Plaintiff has not made a demand on NVIDIA's Board to investigate and prosecute the wrongdoing alleged herein. Such a demand is futile and therefore excused because: (i) a majority of the Board is unable to conduct an independent and disinterested investigation of the alleged wrongdoing; and (ii) the Board's wrongful conduct is not subject to protection under the Business Judgment Rule. Under such circumstances, the demand requirement is excused since making such a demand on the Board would be futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

91.     As each of the Individual Defendants face a substantial likelihood of liability for the misconduct alleged herein, there is a reasonable doubt as to their disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

92.     The Individual Defendants had knowledge of misconduct within the Company, but chose not to take action when timely action could have prevented, or at least minimized, the damage caused to NVIDIA by such misconduct.

93.     The Individual Defendants control NVIDIA and cannot act with independence and disinterestedness in considering a demand.

94.     Each of the Individual Defendants knew of, recklessly disregarded and/or directly benefited from the wrongdoing complained of herein.

95.     The Individual Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred or disregarded the wrongs complained of herein, and are therefore not disinterested parties.

96.     NVIDIA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not attempted to recover for NVIDIA the damages NVIDIA suffered.  NVIDIA continues to employ the Individual Defendants who were responsible for the damages and has not publicly reported any disciplinary action taken against them.

97.     In order to bring this action for breach of fiduciary and common law duties, the members of the Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do.  As such, the Defendants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cannot act in a disinterested and independent manner in considering a demand.  For example, in addition to their service together on the NVIDIA Board:

- Defendants Coxe and Gaither work together at Sutter Hill Ventures LLP, where Defendant Coxe is a Managing Director and Defendant Gaither is a partner. They both also serve as members of the Board of Seesaw Inc.  Therefore, there is reasonable doubt that they could vigorously prosecute any such action and exercise independent business judgment.

- Defendant McCaffery is Chairman, Managing Director, and Co-Founder of Makena Capital Management LLC ("Makena").  Defendant Gaither is a former Director at Makena. Therefore, there is reasonable doubt that they could vigorously prosecute any such action and exercise independent business judgment.

98.     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, did, and do, dominate and control the Individual Defendants. Thus, the Board could not consider a demand in an independent and disinterested manner.

99.     The acts complained of herein constitute breaches of fiduciary duties by the Individual Defendants and are, thus, incapable of ratification.

100.     Publicly traded companies, such as NVIDIA, typically carry Director & Officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that would foreclose a recovery from the insurers in the event that NVIDIA sues to recover its damages from the Individual Defendants.

101.     The Individual Defendants were aware of, but failed to investigate, red flags of illegal or improper conduct and failed to take timely action to prevent, or at least minimize, the damages

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

caused. A majority of the members of the NVIDIA Board have demonstrated unwillingness and/or an inability to act in compliance with their fiduciary obligations.

102. NVIDIA Board members have benefited and will continue to benefit from the wrongdoing alleged herein. The Individual Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of NVIDIA. Certain Individual Defendants sold NVIDIA shares at prices artificially inflated by their false and misleading statements and omissions. Bringing this action would jeopardize their positions of control and the associated perquisites, thereby rendering them incapable of exercising independent objective judgment in deciding whether to bring this action.

103. The violations alleged herein were of sufficient magnitude that the Individual Defendants must have either known of the wrongdoing, but turned a blind eye, or recklessly disregarded the wrongdoing, all of which was in direct violation of their fiduciary duties.

104. The violations alleged herein concerned the Company's core operations. As such, the Individual Defendants must have either known of the wrongdoing, but turned a blind eye, or recklessly disregarded the wrongdoing, all of which was in direct violation of their fiduciary duties.

105. The Individual Defendants' disregard of illegal and improper conduct, as embodied by their systematic failure to implement adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable laws, rules and regulations, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of liability for their actions/inactions.

### A. Demand is Futile as to the Audit Committee Members

106. The members of the Audit Committee are not disinterested or independent because, as members of the Audit Committee during the relevant period, they face a substantial likelihood of liability for the misconduct alleged herein. The Audit Committee of the Board had oversight

responsibilities for the Company's internal control policies and procedures, was required to ensure that the Company was operating in accordance with its prescribed policies, procedures and codes of conduct, and was charged with overseeing the Company's compliance with laws and regulations. Timely action by the Individual Defendants serving on the Audit Committee would have prevented, or at least minimized, the damages caused to NVIDIA and its shareholders caused by the wrongdoing discussed herein.

107.    Moreover, the members of the Audit Committee failed to discharge in good faith and with the required diligence and due care their responsibilities: namely, to ensure that procedures and controls were designed to accurately report the Company's financial condition and business prospects.  These Defendants reviewed, authorized, and/or caused the publication of materially false and misleading statements and omissions throughout the relevant period and failed to ensure that adequate controls and procedures were in place to accurately report the Company's financial condition and business prospects.

108.    Defendants Huang and Kress are named as defendants in securities class action lawsuits and, as such, are neither independent nor disinterested for the purpose of considering a demand.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against the Individual Defendants)

109.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

110.    The Individual Defendants owed and owe fiduciary duties to NVIDIA and its stockholders.  By reason of their fiduciary duties, the Individual Defendants owed and owe NVIDIA and its shareholders the highest obligation of good faith, due care and loyalty in the administration of

the affairs of the Company, including, without limitation, the oversight of NVIDIA's reporting regarding its financial condition and business prospects.

111.    NVIDIA now faces material liability for the Individual Defendants' misconduct.

112.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties, NVIDIA has sustained, and will continue to sustain, significant damages – both financially and to its reputation and goodwill.

113.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company for the damages resulting directly and proximately from these breaches of fiduciary duty.

## COUNT II

### Waste of Corporate Assets
### (Derivatively Against the Individual Defendants)

114.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

115.    The Individual Defendants breached their fiduciary duties and, thereby, caused NVIDIA to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

116.    The Individual Defendants have bestowed upon themselves grossly excessive compensation that has no reasonable or legitimate basis, and have caused the Company to purchase shares at prices artificially inflated by their false and misleading statements and omissions.

117.    As a direct and proximate result of these breaches of their fiduciary duties, NVIDIA has sustained and will continue to sustain significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### Aiding and Abetting
### (Derivatively Against the Individual Defendants)

118.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

119.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, disregard to the fact that the other Individual Defendants are in breach of their fiduciary duties to NVIDIA and have participated in such breaches of fiduciary duties.

120.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their duties.

121.    Because the actions described herein occurred with the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

122.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## COUNT IV

### Gross Mismanagement
### (Derivatively Against the Individual Defendants)

123.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

124.    The Individual Defendants had a duty to NVIDIA and its shareholders to prudently supervise, manage and control the operations, business and internal controls of NVIDIA.

125.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of NVIDIA in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith, due care, loyalty, diligence and candor in the management and administration of NVIDIA's affairs and in the use and preservation of Company assets.

126.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct.  As a result, the Individual Defendants grossly mismanaged the Company.

## COUNT V

### Violations of Section 14(A) of the Exchange Act
### (Derivatively Against the Individual Defendants)

127.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein, except for allegations of fraud or knowing misconduct.  For purposes of this count only, Plaintiff expressly disclaims any allegations of fraud.  This count, therefore, does not sound in fraud and is based upon negligent conduct by the Individual Defendants.

128.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances

-34-

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

129.    In the Proxy, the Board issued the materially false and misleading statements in the Audit Committee report that the Audit Committee "reviewed and discussed the audited consolidated financial statements for Fiscal 2017 with management and our internal control over financial reporting with management…" including items to be disclosed.  What was not disclosed, however was (1) NVIDIA's GPU sales growth was driven by demand in the cryptocurrency market; (2) the statement that the Company's executives are "masters at managing our [inventory] channel" was false; (3) the Company wasn't well positioned to adjust to the rapidly changing cryptocurrency mining sector; (4) even as the cryptocurrency market was crashing, NVIDIA placed Pascal graphics cards in the market, hiding stagnation in cryptocurrency mining; (5) the Company was stuck with a backlog of three months of inventory; and (6) the Company lacked internal controls.

130.    Individual Defendants' statements in the Proxy were false and misleading and omitted material facts.

131.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

132.    The misrepresentations and omissions in the Proxy were material to Plaintiff in voting on the Proxy.  The Proxy was an essential link in the Individual Defendants' continuation of their positions with the Company and continued receipt of their lucrative compensation therefor.

133.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy.

## COUNT VI

### Violations of Section 10(B) of the Exchange Act and SEC Rule 10b-5
### (Derivatively Against the Individual Defendants)

134.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

135.    In connection with NVIDIA's repurchase of shares, the Individual Defendants disseminated and/or approved false and/or misleading statements about NVIDIA, which they knew, or recklessly disregarded, were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Individual Defendants' course of conduct were designed to, and did, artificially-inflate the price of the Company's common stock.

136.    At the same time that NVIDIA's stock price was inflated due to the Individual Defendants' false or misleading statements, the Individual Defendants caused the Company to repurchase millions of shares of common stock at artificially-inflated prices to the detriment of NVIDIA and its shareholders.

137.    The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon NVIDIA in connection with the Company's purchases of NVIDIA stock.

138.    The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or the United States mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted material facts necessary in

-36-

order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of NVIDIA's stock.

139.    The Individual Defendants were executives and/or the directors of the Company, and were, therefore, directly responsible, and are liable for all materially false and misleading statements and material omissions alleged above.

140.    The misstatements and omissions of material facts set forth herein were either known to Individual Defendants or were so obvious that Individual Defendants should have been aware of them.  The Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

141.    Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of NVIDIA's stock by the Company.

142.    As a result of Individual Defendants' misconduct, NVIDIA has and will suffer damages in that it paid artificially inflated prices when purchasing NVIDIA common stock and suffered losses when the previously undisclosed facts occurring during the relevant period were disclosed.  NVIDIA would not have purchased these securities at the prices it paid, but for the artificial inflation in the Company's stock price caused by Individual Defendants' false or misleading statements and omissions.

143.    As a direct and proximate result of Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of NVIDIA stock.  By reason of such conduct, Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

144.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT VII

### Violations of Section 20(A) of the Exchange Act
### (Derivatively Against the Individual Defendants)

145.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

146.    This Count is asserted on behalf of NVIDIA against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

147.    During their tenures as officers and/or directors of NVIDIA, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of NVIDIA, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Each of the Individual Defendants was able to and did control, directly and indirectly, the content of the public statements made by NVIDIA during the relevant period, which include NVIDIA's materially false and misleading financial statements contained therein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

148.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial, regulatory and legal compliance, internal control procedures, and its accounting and reporting functions.  The Individual Defendants signed the Company's SEC filings during the relevant period, and were directly involved in providing false

-38-

information and/or certifying and/or approving the false statements disseminated by NVIDIA during the relevant period. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of NVIDIA within the meaning of Section 20(a) of the Exchange Act.

149.    As set forth above, the Individual Defendants violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of NVIDIA and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, to the Company.  Moreover, as detailed above, during the respective times the Individual Defendants served as officers and/or directors of NVIDIA, each of these Defendants was culpable for their material misstatements and omissions, as set forth above.

150.    As a direct and proximate result of the Individual Defendants' conduct, NVIDIA has suffered damages in connection with the wrongs alleged above.

151.    Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under the law and that demand is excused;

B.    Finding that the Individual Defendants breached their fiduciary duties;

C.    Finding that all Individual Defendants were unjustly enriched;

D.    Against all Individual Defendants in favor of the Company as a result of the Individual Defendants' breaches of fiduciary duty;

E.     Against all Individual Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity;

F.     Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight over its financial reporting;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney's, consultant's and expert's fees; and

H.     Granting such other and further relief as the Court deems just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

Dated: February 19, 2019

WEISSLAW LLP


Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348


WEISSLAW LLP
David C. Katz
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Plaintiff's Counsel*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT